AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT

FEB 2 7 2025

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| | |
|---|---|
| United States of America | |
| v. | Case No.    2:25-mj-01051-DUTY |
| Aliyah Torice WRIGHTS | |
| Defendant. | |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, Ashley Holly, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about the date of February 25, 2025, in the County of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 841(a)(1) | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
_____
Complainant's signature

Ashley Holly, Special Agent, HSI
Printed name and title

/ / /

/ / /

/ / /

AUSA: Clifford Mpare (x4962)

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  _2/27/2025 at 8:00, m_ _____

_____
*Judge's signature*

City and state:  Los Angeles, California _____

_____
Hon. , Jacqueline Chooljian
*Printed name and title*

AUSA: Clifford Mpare (x4962)

## AFFIDAVIT

I, Ashley E. Holly, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint against and arrest warrant for Aliyah WRIGHTS ("WRIGHTS"), for violating Title 21, U.S.C. § 841(a)(1): possession with intent to distribute a controlled substance.

2.    This affidavit is also made in support of an application for a warrant to search the following digital devices (the "SUBJECT DEVICES") seized from WRIGHTS' belongings and currently in the custody of Homeland Security Investigations ("HSI") in El Segundo, California, and described more fully in Attachment A:

    a.    a royal blue Apple iPhone in a light blue case ("SUBJECT DEVICE 1");

    b.    an Apple iPhone in a clear case with blue ring sticker ("SUBJECT DEVICE 2");

3.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances), 21 U.S.C. § 846 (conspiracy to distribute controlled substances); 21 U.S.C. § 953(a) (unlawful exportation of controlled substances), 21 U.S.C. § 960 (knowing exportation of controlled substances), (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel, witnesses, and databases.  This affidavit written in good faith and is intended to show that there is sufficient probable cause for the requested complaint and warrants and does not purport to set forth all my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. **BACKGROUND OF AFFIANT**

5.    I am a Special Agent with United States Homeland Security Investigations ("HSI"), where I have worked since June of 2024.  I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(c), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.  In the course of my work, I have conducted physical surveillance and reviewed electronic records.

6.    To date, I have completed the Criminal Investigator Training Program and the HSI Special Agent Training program at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia.  During my approximately six months at FLETC, I completed courses that cover criminal investigative functions, criminal law, immigration law, and customs law.

7.    Prior to my tenure as a SA, I was a formally trained scientist Doctor of Philosophy in Regulatory Biology where I

investigated complex problems in various human diseases
including cancer and metabolism. During my training I learned
unique skill sets both in the laboratory and clinical setting
which provides me with a unique lens to investigate and solve
critical problems as well as the collection, processing, and
analysis of data and evidence with integrity. I also hold an
Associate's of Science degree, a Bachelor's of Arts degree in
Microbiology, and a Master's in Business Administration degree.

### III. SUMMARY OF PROBABLE CAUSE

8.    On February 25, 2025, HSI duty agents were notified by
United States Customs and Border Protection ("CBP") of a
passenger, later identified as WRIGHTS, attempting to
smuggle cocaine out of Los Angeles International Airport ("LAX")
on an outbound flight to Hong Kong. Upon inspection, WRIGHTS
was found in possession of approximately 15.81 kilograms of
cocaine located in her locked carry-on bag.

### IV. STATEMENT OF PROBABLE CAUSE

9.    Based on my involvement in this investigation, my
conversations with other law enforcement officials involved in
this investigation, my review of photos, reports and records
connected to this investigation, as well as interviews
conducted, I am aware of the following:

### A.    CBP Officers Discover Cocaine in WRIGHTS' Carry On Bag

10.    Prior to WRIGHTS' arrival at LAX, CBP flagged WRIGHTS
for additional luggage inspection based on a CBP analysis of
current drug smuggling trends at LAX. On the evening of
February 25, WRIGHTS arrived at LAX and checked in for her

United Airlines flight to Hong Kong.  As part of that process, she checked two bags.  Once those bags traveled from the United Airlines check in counter to the CBP baggage screening area, CBP personnel opened those bags to look for drugs but did not find any.

11.  Then, after WRIGHTS completed her United Airlines check in process in LAX Terminal 7, she walked from Terminal 7 to LAX Terminal 6.  Once in Terminal 6, she proceeded through Transportation Security Administration screening and into the flight departure area of Terminal 6.  Then, WRIGHTS walked from Terminal 6 back to Terminal 7 toward a pet relief area in that terminal.  When WRIGHTS arrived at the door to the pet relief area, she met with a man carrying a large green backpack (the "Green Backpack").  WRIGHTS and that man appeared to exchange words, and WRIGHTS entered the pet relief area.  A short time later, WRIGHTS emerged from the pet relief area carrying the Green Backpack.

12.  After WRIGHTS left the pet relief area with the Green Backpack, she proceeded to her departure gate in Terminal 7. Later, WRIGHTS began the boarding process for her flight to Hong Kong.  After she scanned her ticket at the gate, she entered the gangway and waited to board the plane.  Before she could board, however, CBP officers approached her and asked her about the Green Backpack.  In substance and summary, WRIGHTS told the CBP officers that someone else gave her the backpack and she did not know what contents the backpack held.  Additionally, WRIGHTS stated that she did not have a key to the lock on the backpack.

4

13.   At that point, CBP officers used a key to open the
lock on the Green Backpack.  Once the backpack was open, the
officers searched the backpack and found several vacuum-sealed
packages that appeared to contain drugs inside.  Given that
discovery, CBP officers asked WRIGHTS to accompany them to a
separate CBP screening area inside LAX and WRIGHTS complied.
Once WRIGHTS arrived at the CBP screening area, one of the CBP
officers conducted a field test of one of the packages of
suspected drugs.  That field test returned a presumptive
positive result for the presence of cocaine inside the package.
A CBP officer weighed all the vacuum-sealed packages found
inside the Green Backpack and learned that they collectively
weighed 15.81 kilograms.

**B.    HSI Interview of WRIGHT**

14.   At approximately 1:40 a.m. on February 26, 2025, my
partner and I arrived at the CBP screening area to interview
WRIGHTS.  I advised her of her Miranda rights, and WRIGHTS said
she understood those rights and agreed to be interviewed.  In
substance and summary, she said:

a.   the flight to Hong Kong that she had attempted to
board had been booked for her by someone else;

b.   the person who booked her flight provided details
about her travel incrementally through a phone messaging
application;

c.   once she arrived at LAX, she received
instructions through the phone messaging application to enter

5

the pet relief area in Terminal 7 and pick up a bag to carry on
to her flight;

d.    when she walked into the pet relief area, there
was only one bag available to pick up that she described as a
"green," "big, super big," "duffle backpack;"

e.    after she picked up the bag, she received an
instruction through the phone messaging application telling her
to board the flight to Hong Kong;

f.    she felt that her planned travel became "super
serious," once she arrived at LAX and began receiving
instructions through the phone messaging application;

15.    My partner and I asked WRIGHTS for consent to search
the SUBJECT DEVICES, but she declined to give consent.

### V.    TRAINING AND EXPERIENCES ON DRUG OFFENSES

16.    Based on my training and experience and familiarity
with investigations into drug trafficking conducted by other law
enforcement agents, I know the following:

a.    Drug trafficking is a business that involves
numerous co-conspirators, from lower-level dealers to higher-
level suppliers, as well as associates to process, package, and
deliver the drugs and launder the drug proceeds.  Drug
traffickers often travel by car, bus, train, or airplane, both
domestically and to foreign countries, in connection with their
illegal activities in order to meet with co-conspirators,
conduct drug transactions, and transport drugs or drug proceeds.

b.    Drug traffickers often maintain books, receipts,
notes, ledgers, bank records, and other records relating to the

manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c.     Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.     Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

### VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

17.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[1] As used herein, the term "digital device" includes SUBJECT DEVICES.

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

      a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

      b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

8

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

18.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000

9

average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

19. The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

a. Users may enable a biometric unlock function on
some digital devices. To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device. To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second. To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts. Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time. I do not know
the passcodes of the devices likely to be found in the search.

c. The person who is in possession of a device or
has the device among his or her belongings is likely a user of

10

the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress WRIGHTS' thumb and/or fingers on the SUBJECT DEVICES; and (2) hold the SUBJECT DEVICES in front of WRIGHTS' face with her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

17.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. **CONCLUSION**

18.    For all the reasons described above, I submit that there is probable cause to believe that WRIGHTS has committed a violation of Title 21, U.S.C. § 841(a)(1): possession with intent to distribute a controlled substance.  I further submit that there is probable cause to believe that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 27 day of
February 2025 at 5:00 p.m

HON. JACQUELINE CHOOLJIAN
UNITED STATES MAGISTRATE JUDGE

11

**ATTACHMENT A**

PROPERTY TO BE SEARCHED

The following digital devices (the "SUBJECT DEVICES"), which were seized from Aliyah WRIGHTS on or about February 25, 2025, and are currently in the custody of Homeland Security Investigations in El Segundo, California:

a.    a royal blue Apple iPhone in a light blue case ("SUBJECT DEVICE 1");

b.    an Apple iPhone in a clear case with blue ring sticker ("SUBJECT DEVICE 2").

The SUBJECT DEVICES are depicted below:




 

13

**ATTACHMENT B**

## I.  ITEMS TO BE SEIZED

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances), 21 U.S.C. § 846 (conspiracy to distribute controlled substances); 21 U.S.C. § 953(a) (unlawful exportation of controlled substances), 21 U.S.C. § 960 (knowing exportation of controlled substances), (the "Subject Offenses"), namely:

a.    Records, documents, programs, applications and materials, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

b.    Records, documents, programs, applications or materials, sufficient to show SMS text, email communications or other text or written communications sent to or received from the SUBJECT DEVICES and which relate to the above-named violations;

c.    Records, documents, programs, applications or materials, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from the SUBJECT DEVICES and which relate to the above-named violations;

d.    Records, documents, programs, applications, materials, or conversations relating to the trafficking of

14

drugs, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed;

        e.   Audio recordings, pictures, video recordings, or still captured images related to the possession, purchase, sale, transportation, or distribution of drugs or the collection or transfer of proceeds of the above-described offenses;

        f.   Contents of any calendar or date book, which relate to the above-named Subject Offenses occurring on or after June 1, 2024;

    2.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations, which relate to the Subject Offenses occurring on or after June 1, 2024; and

        a.   Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

    3.   With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

        a.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents,

browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

      b.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

      c.   evidence of the attachment of other devices;

      d.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

      e.   evidence of the times the device was used;

      f.   passwords, encryption keys, and other access devices that may be necessary to access the device;

      g.   applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

      h.   records of or information about Internet Protocol addresses used by the device;

      i.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

      4.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records,

16

documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

II.  **SEARCH PROCEDURE FOR THE SUBJECT DEVICES**

5.   In searching the SUBJECT DEVICES (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.   The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.   The search team shall complete the search of the SUBJECT DEVICES as soon as is practicable but not to exceed one year from the date of issuance of the warrant.  The government will not search the digital devices and/or forensic images thereof beyond this one-year period without obtaining an extension of time order from the Court.

d.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of

17

the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

        ii. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

        iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

        e. The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

        f. If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

        g. If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

18

h.    If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

i.    The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

j.    After the completion of the search of the SUBJECT DEVICES, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

6.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

19

7.    During the execution of this search warrant, law enforcement is permitted to (1) depress WRIGHTS' thumb- and/or fingers onto the fingerprint sensor of the SUBJECT DEVICES (only if the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of WRIGHTS' face with her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.    In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.